## CITY OF BARNSDALL v. BARNSDALL NAT. BANK OF BARNSDALL et al.

No. 26045. Nov. 29, 1938.

Rehearing Denied Feb. 21, 1939.

Application for Leave to File Second Petition for Rehearing Denied June 13, 1939.

H. M. Curnutt, for plaintiff in error.

Hamilton & Howard, for defendants in error.

WELCH, J. The defendant below has appealed. We will generally refer to the parties as plaintiffs and defendant, as they appeared in the trial court. Plaintiffs' action is founded upon the fact that one Hammer, who at the time was vice president and active managing officer of the bank,

and at the same time treasurer of the defendant city, paid by draft drawn by him on the bank two interest coupons for the city, totaling $6,015, and plaintiffs seek recovery upon the theory that the bank received no reimbursement therefor from the city. The drafts were drawn January 29, 1923, and July 31, 1923. It was discovered in November, 1923, that Hammer had embezzled about $50,000 of the bank's funds and the stockholders, who are parties plaintiff here, made good the loss and claimed subrogation upon the theory that they paid the city's obligations without reimbursement or recompense.

This is the second appeal to this court in this case. On the former appeal see City of Barnsdall v. Barnsdall National Bank, 164 Okla. 167, 23 P.2d 373. A full statement of facts is found in the former opinion. We will reiterate only such facts as are necessary to clarify our views of the issues now before us. In the former appeal it was one of the contentions that plaintiffs had made no showing that the city had provided funds to pay the interest coupons which were paid by the drafts of the bank. It was therein held, in effect, that if no funds had ever been provided for such purpose, the plaintiffs could not prevail under the rule of subrogation, because in such case the payment would have been in law a voluntary one. The former judgment was reversed and the cause remanded so plaintiffs might have an opportunity to make proof that funds had been so provided, and for the purpose of then determining the equities between the parties if funds had in fact been provided by the city. Upon the second trial it is clearly shown that the city had provided funds for the payment of the interest coupons, and therefore the plaintiffs are not in the position of being barred as volunteers from seeking subrogation.

The result of the former appeal was the reversal of the former judgment and the remanding for a new trial to determine the equities of the parties, upon showing being made as to the city's provision of and for its sinking fund.

And so, upon the trial from which this appeal is taken, it was clearly established that the defendant city had provided a sinking fund for the payment of the interest coupons. It was also established that on June 29, 1922, the defendant city had $12.712.66 of its sinking funds on deposit with the plaintiff bank; that subsequent thereto and up to June 30, 1923,

there was deposited additional sinking funds in the bank in the total sum of $5,783.58, making a total amount of $18,496.24 received by the bank as deposits to the city's sinking fund to the last above named date. These figures are taken from the records of deposit which are undisputed by the bank. There is other evidence showing deposits within said period aggregating a greater sum.

When these deposits were received by the bank the relation of debtor and creditor between the bank and the city was created thereby. State ex rel. Barnett v. Exchange Nat. Bank of Tulsa, 172 Okla. 361, 45 P.2d 759; Shull, State Bank Com'r, v. Town of Avant, 159 Okla. 271, 15 P.2d 49; Multnomah Co. v. Oregon Nat. Bank (C. C. A.) 61 F. 912; Board of County Com'rs v. State Nat. Bank of Idabel, 169 Okla. 182, 36 P.2d 281; Dempsey Oil & Gas Co. v. Citizens Nat. Bank, 110 Okla. 39, 235 P. 1104. Such being the case, before the bank's obligation becomes discharged, it must show proper disbursements or proper charges against the city's deposits.

Inasmuch as plaintiff's claims are based upon alleged payments of the city's obligations out of the bank's money without reimbursement, it would seem apparent that the claim could not be well founded in equity if at the time the claim is made the bank owed the city an equal or greater amount.

The statement of the charges against the deposits which the bank asserts as correct charges are the following:

| | | |
|---|---|---|
| June 29, 1922 | _____ | $9,176.56 |
| July 14, 1922 | _____ | 6,000.00 |
| Aug. 10, 1922 | _____ | 1,206.81 |
| Sept. 11, 1922 | _____ | 300.00 |
| Nov. 22, 1922 | _____ | 350.00 |
| Dec. 22, 1922 | _____ | 500.00 |
| Dec. 30, 1922 | _____ | 446.60 |
| Totaling | _____ | $17,979.97 |

—leaving only the small balance of $516.27, which balance had been paid to the city.

These charges, however, are forcefully contradicted by other evidence which we consider binding upon the plaintiffs and largely decisive of this cause.

There was introduced in evidence an instrument purporting to be a statement furnished by the bank for the information of its depositor, the city, with reference to the condition of its sinking fund deposit for the above-mentioned period. This statement was in the regular form used by the

bank for such purposes. The trial court seems to have proceeded on the theory that this statement was kept by Hammer to deceive the city or others as to the condition of the city's bank deposit of sinking funds, or. to satisfy the city or others as to the correct credit of the city in that bank deposit. The amount of credit shown in that statement was the correct amount which the city should have had as a balance on deposit in its sinking fund. We think the plaintiffs, under the facts herein disclosed, are bound by such statement.

Hammer, at all times hereinabove mentioned, was the treasurer of the city; at the same time he was vice president and managing officer of the bank; he had complete charge and control of all the bank records, and the directors and other officers and employees made no substantial efforts to examine into any of his acts whatsoever in relation to any of the bank's affairs. Although the bank had a cashier, he was outside of the bank most of the time, and Hammer appears to have practically handled all of the bank's affairs alone. It would seem that Hammer was generally the only official of the bank available from whom information could be obtained concerning accounts or balances. We think when he exhibited this statement to other proper persons interested in the fiscal condition of the city's affairs, that it cannot be doubted that he did so as an agent of the bank. If in fact the same was not a true statement of the city's sinking fund account in the bank, it can scarcely be questioned from this record that Hammer had possessed himself of same for the purpose of assuring proper inquirers of his sinking fund bank account, and that he did so use the same seems certain, inasmuch as the city procured an audit to be made at the end of the mentioned period, which audit conforms to such statement instead of the one which plaintiffs claim to be correct.

The audit was made at the instance of the city, was undoubtedly relied upon by the city and is in exact conformity with this statement, referred to by plaintiffs as "bogus."

Such statement and the audit obviously prepared therefrom show only three charges against the bank account of the city's sinking fund for the period from June 28, 1922, to June 30, 1923. These charges totaled $11,661, and are all admitted as correct charges by the defendant city. This left a balance of the admitted deposits on June 30, 1923, of $6,835.24. A greater balance was in fact shown thereby due to a record thereon of additional deposits, but the balance of the admitted deposits are in excess of plaintiffs' claims herein. This representation of charges against this bank account, obviously relied upon by the defendant city's agents and auditors, and furnished by the active managing officer of the bank, under the facts and circumstances here, precludes the plaintiffs from asserting the charges shown on the other bank records and enumerated above. It cannot properly be said that this statement so used by Hammer is not a record of the bank. It was used by Hammer as an official of the bank in disclosing the bank account, and not in disclosing the records of the city treasurer's accounts, and when so used it became a record of the bank for purposes of our present consideration.

No showing is made or attempted to be made of any other proper disbursement by the bank of this balance on deposit. It therefore follows that the defendant's equities are equal to or greater than those of plaintiffs, because the amount the bank owed defendant is equal to or greater than the amount of the bank's funds used for the payment of the city's obligations. The city may owe the bank, but the bank owes the city an equal or greater amount. It would appear equitable that the respective accounts be balanced, offset, or canceled in the amount in controversy.

The city had ample funds with which to pay the interest coupons on deposit in the bank at the time the bank's money was used for their payment. The bank has not accounted to the city for so much of the funds as were used for the payment, all of which is shown by the great weight of the evidence. In an action of purely equitable cognizance, this court will consider the entire record and weigh the evidence and cause to be rendered such judgment as the trial court should have rendered. Teachers Conservative Investment Ass'n v. England et al., 115 Okla. 298, 243 P. 137.

The judgment is reversed, and judgment is rendered in favor of the defendant.

OSBORN, C. J., and PHELPS, CORN, HURST, and DAVISON, JJ., concur. RILEY, J., dissents. GIBSON, J., concurs in part and dissents in part. BAYLESS, V. C. J., absent.

GIBSON, J. (dissenting in part). During the year 1922 and until November, 1923,

Karl Hammer was city treasurer of Barnsdall and also the managing officer of the Barnsdall National Bank, where the accounts of the city treasurer were kept. On February 1, 1923, and August 1, 1923, interest coupons on waterworks bonds of the city became due. To pay these coupons Hammer drew drafts against the bank's account with one of its correspondents. Each draft was for the sum of $3,007.50, drawn respectively January 29 and July 31, 1923.

Proof of the payment of the drafts by the bank and the subsequent payment of the statutory assessment levied against the stockholders do not, without more, establish a claim of subrogation. As against the city the report of the bank examiner and the action of the directors and stockholders in response thereto is purely hearsay or incompetent, since the city is no more bound by such ex parte report or action than any other depositor would be. The plaintiffs, however, went further than this. They attempted to prove that there was no corresponding charge against the treasurer's sinking fund account in the bank, and that reimbursement had not been had otherwise. The best evidence of the fact that the items were not charged to the city's sinking fund or other account in the bank, of course, would be the individual ledger accounts of the bank showing the deposits and disbursements by the city treasurer. Some of the ledger sheets were unaccounted for. A copy of one of the sinking fund accounts was sufficiently identified.

The city, however, had employed two firms of auditors to make audits of its treasurer's accounts and produced a member of each firm to testify. Mr. Devlin, whose firm audited the city's books for the period ending June 30, 1923, testified that, after city officials had called his attention to a discrepancy in the audit made by his firm and the bank's records, he went to the bank, examined the individual ledger sheets in the bank, and discovered that no charge for the first draft had ever been made against the city; and the second auditor, Mr. Gambill, testified that there was no charge against the city's accounts in the bank for the second payment made. This evidence, with the evidence of the plaintiffs on this point, definitely established that the bank paid the drafts without reimbursement from the city. The question of equities, as pointed out in the prior opinion (164 Okla. 167, 23 P.2d 373), arises

from the embezzlement by Hammer of the funds of both the bank and the city.

The city, as a defense, contends that its equities are superior or equal to those of the bank, because of the alleged fact that Hammer embezzled its sinking funds prior to the drawing of the drafts. This theory is in accordance with the former decision of this court. It further contends that the equities are with the city because a judgment against the city would compel the city to pay these claims twice. Either of these defenses, if established, would defeat the plaintiffs' claims.

The claim that a judgment against the city will result in a duplicate payment rests upon the theory that the city's accounts were as a matter of fact charged with these items, and further that, in reconciling accounts, the auditor last examining the city's books made credits and charges which resulted in reducing the claims of the city against the bank and Hammer by the amount of these drafts.

A careful search of the record determines the following facts. The city early brought suit against the bank and its successor to recover from the banks the amounts it claimed should have been on hand. In this suit the city should have discovered what had been the status of its accounts with the bank from time to time and enough facts to lead it to inquire. In this suit also it should have learned that claim was being made by the bank or its stockholders that the city had not paid the bank for the drafts. In a subsequent suit, also, by the successor bank the city was again informed that reimbursement for these items was denied. In this latter suit the court held that these plaintiffs were the proper ones to bring the action. These intervening court proceedings explain the delay referred to in the former opinion.

From what has been said heretofore in reference to the admissions of the auditors, it definitely appears that the items have never been charged to the city's accounts in the bank and that, so far as the bank and its privies are concerned, no reimbursement has been had. It is true that the auditor in stating an account for the city in his audit made certain reconciling adjustments, but there is no evidence that the bank ever saw or accepted that audit or made settlement with the city on that basis. What is called a "phoney" ledger sheet of the sinking fund account of the city with the bank was partially identified. If it had in fact been kept in the individual

ledger of the bank and were genuine, it would be proof enough to show that the drafts were charged to the city and, therefore, would defeat plaintiffs' claims.

Attempts were made to identify this as a record of the bank; but I think that the court's conclusion as to its authenticity and purpose is amply supported by the record. It was not a bank record nor a true statement from a bank record, hence was not binding on the bank as showing these charges against the city's account in the bank.

Here it should be said that the trial court stated that he admitted this statement of the bank's ledger sheet in evidence, subject to the findings the court made in reference thereto; that it was "an instrument no doubt furnished by Mr. Hammer to Mr. Steele when he tried to deceive him in making this audit." The plaintiffs specifically stated they did not except to the findings of the court, but did except to the admission of the instrument. Therefore I do not consider the statement as an instrument made by or authorized by the bank; it was admissible, however, on the question of embezzlement to show not only the admissions made by Hammer therein as to what his account should have been, but also the "covering up," which is a common badge of an embezzler.

Facts pertinent to prove the embezzlements of Karl Hammer are adducible from the following testimony. Mr. Little, one of plaintiffs and a former officer of the bank, testified that the balance in the sinking fund account in the bank on June 28, 1922, was $12,712.66. This corresponds to the amount shown on the statement identified by the bookkeeper, and there is no dispute as to this amount. The plaintiffs proved that for the fiscal year beginning July 1, 1922 (ending June 30, 1923), approximately $10,000 had been collected from a sinking fund levy made for that year. There is some evidence that embezzlement of a portion of the sinking fund of $12,712.66, or of that portion of the current tax levy, had occurred prior to February 1, 1923, but I cannot say that it is so clear and convincing as to warrant overturning the judgment of the trial court as to that item. I cannot accept the general subsequent conclusion of shortage to establish a date prior to February 1, 1923.

But the evidence as to embezzlement prior to the payment of the second item is clearly established by the following facts. First, there is the undisputed amount as of June 28, 1922, in the sinking fund account in the bank. Added to this are the various amounts of warrants for taxes collected during the year as above set forth. Some of these items were shown by the warrants introduced by plaintiffs. Other items appeared on the true ledger sheet, as shown by the bookkeeper's testimony, so that the total to the credit of the sinking fund account at the close of the fiscal year ending June 30, 1923, should have been in excess of $25,000, less proper charges against these items. Proper charges would be the payment of coupons due August 1, 1922, and February 1, 1923. That the former was properly paid and charged to the city is not denied. What other proper items were deductible is not shown, and need not be inquired about, as appears from the admissions made by Hammer.

Karl Hammer admitted that on June 30, 1923, he should have had on hand in the sinking fund in the bank, after deducting all proper charges, the sum of $13,977.48, as appears from his sworn statement to the city's budget for the year 1923, and from the "phoney" ledger sheet, which is sufficiently traced to him as to be considered as an admission by him as to matters therein contained. In two places, therefore, he gives this as the true amount he should have had on hand. The sum which should have been on hand may have been in excess of that amount. The auditors fixed the total sinking fund shortage at approximately that figure. The city brought a suit against the bank to recover that amount. In that action the bank answered under oath, denying that said sum was on deposit in the bank on June 30, 1923, and declaring that on that date only $516.27 was in the sinking fund account, and that on October 23, 1923, an additional deposit was made bringing the total to $711.94, which was paid to the new city treasurer, thus closing the account. The latter items correspond to the entries shown on the ledger statement furnished the last auditor by the bank's bookkeeper. Undoubtedly this ledger statement, a duplicate or original sheet, was the basis of the bank's defense in the suit brought by the city.

The foregoing suit went to judgment and the bank won. Its defense was not that the amount claimed should not have been on hand, but that it was not on hand. It therefore appears conclusively that instead of having in his sinking fund account the sum of $13,977.48, as he admitted he should have had, Hammer had only $516.27. The answer to the disappearance of this sum

is only that Hammer, before June 30, 1923, embezzled all these sinking fund moneys except the $516.27. Furthermore, a comparison of the bank account as it appeared on the regular ledger sheet with the warrants shown by the testimony as representing collection of sinking funds, discloses that warrants dated March 21, 1923, April 20, 1923 April 28, 1923, May 5, 1923, and June 12, 1923, aggregating $9,194.41, although indorsed by Hammer and paid at the bank, never reached the sinking fund account although the larger part of these warrants represented sinking fund moneys. A comparison of the amounts of these warrants with the items on the "phoney" sheet discloses that this sheet purports to show deposits on March 21, 1923, which aggregate the total of the warrant of that date, and deposits of April 19th, which aggregate the warrant of April 19th. These entries constitute evidence not only that these items should have been deposited in said account, but also, because of their falseness, in connection with the other facts just recited, that said items had been misappropriated. These are familiar features of embezzlement, which usually in cases of this kind must be established by circumstantial evidence.

There are other corroborating circumstances in the evidence to prove the embezzlement, but the main facts above given, about which there can be no dispute, clearly evidence an embezzlement of almost the entire sinking fund before June 30, 1923. Under the former decision, therefore, the bank on its second cause of action has failed to establish a superior equity.

At the trial the bank endeavored to show that the embezzlements could not have occurred before payment of the coupons because for each current year the taxes were not received for that year until after payment was made. This is too narrow a view of what was meant by the former opinion. It is apparent at once that the coupon due August 1, 1923, could not have been paid out of the taxes levied for that year, for the levies could not have been made by the excise board by that time, and of course the collections of taxes could not begin until months thereafter. In the former opinion the court said that the proof of the levy and collections of taxes for the payment of the coupons was lacking. Then the court said:

"* * * If the legal requirements in this connection had been met, and the funds were on hand, clearly, plaintiffs could establish an equitable right. * * *

"If, on the other hand, said funds had been levied, collected, and embezzled by Karl Hammer, a different situation would prevail. * * *"

It is clear that the court had in mind the idea that if the city had on hand, from tax levies, money that could legally be used for the payment, and that Hammer had embezzled these, then there could be no recovery. Hammer, of course, could not embezzle uncollected items. A sinking fund is not separated into yearly items. When collected it is entire and interest coupons are a first charge against such fund. See McMahan v. Board of Education, 142 Okla. 110, 285 P. 953, where this court said:

"The contention of plaintiff that the interest maturing July 15, 1931, may be paid only from the proceeds of the tax levy for the fiscal year 1931-32 is without merit. We do not pay interest from tax levies or from the proceeds thereof, but from the sinking fund. As long as there is money in that fund, it may be used for the payment of valid claims against the fund. We do not create a separate sinking fund for each fiscal year."

The former opinion in this case must be interpreted by the rule laid down in the foregoing case. If Karl Hammer had not embezzled practically the entire sinking fund before June 30, 1923, there would have been funds with which to pay, legally available. But his embezzlement, possible in large part by his position in the bank, prevented the payment.

In addition to this it appears that the correspondent bank sent monthly statements to the Barnsdall bank of the status of its account. A check of the draft register, properly made by the bank or its officials (as eventually it seems to have been done), should have led to the finding of the shortage. Had the bank early done this, no doubt it could have saved itself, and incidentally the city, much money. It was in better position to discover the fraud than was the city. The bank records were handled by Hammer, not as city treasurer but as bank officer, practically with a free hand.

The equities on the second cause of action are not with the bank. The stockholders' rights rise no higher than were the bank's.

For these reasons, I am of the opinion that the judgment on the first cause of action should be affirmed but on the second it should be reversed with directions to enter judgment for the city.

On Application for Leave to File Second Petition for Rehearing.

Rehearing Denied.

HURST, J. (specially concurring). After considering this case further on rehearing, I concur in the result of the majority that the judgment must be reversed, with directions to enter judgment in favor of defendant city.

The question here s one of weighing the equities between the plaintiffs and the city under the rules announced in the former opinion (164 Okla. 167, 23 P.2d 373). I think there this court simply said that if the city has been unjustly enriched, the plintiffs' equities are superior, but, on the other hand, if the revenues were raised by the city for the payment of the coupons and were embezzled by Hammer rather than returned to the city, one of two innocent persons must suffer and it must be the plaintiffs.

The trial court found that at the time Hammer used the funds of the bank to pay the obligations of the city, the funds levied for such purpose during the two fiscal years in which the interest coupons became payable had not been collected, and therefore concluded that the revenues raised by the city for such purpose could not have been embezzled, or misappropriated by Hammer at the time he paid the semiannual interest installments. But a showing that funds levied for the fiscal years in which the interest payments become due had not been collected before the payment of such installments does not result in unjust enrichment of the city and render plaintiff's equities superior. It is established that tax levies for sinking fund purposes had been made for many years prior to the fiscal years involved herein and that taxes had been collected and deposited in the bank. A sinking fund continues from year to year, and where there is a balance on hand in the fund at the close of the year, it must be carried over into the next fiscal year and is available for any purpose for which that fund may be used. McMahan v. Board of Education of Oklahoma City (1930) 142 Okla. 110, 285 P. 953. This money was embezzled by Hammer and not returned to the city. From what was said in the former opinion, this would be an end to the matter,—the city has not been unjustly enriched, but rather two innocent parties have suffered by the fraud of a third, and the plaintiffs must bear the loss.

This rule is not without reason here. It appears from the circumstances that Hammer embezzled the money by withdrawing it from the sinking fund account in the bank and converting it to his own use. He conceals the withdrawals from the city by exhibiting to the city officials a bogus ledger sheet showing no such withdrawals. It is only by reason of being an officer of the bank that he could cover up his crime. Had he simply been treasurer when he withdrew the money and embezzled it to his own use, the true statement of the bank would have reflected the withdrawals. At best, the equities are equal, and plaintiffs must do more than show equal equities; they must show superior equities. 60 C. J. 708, sec. 20.

My disagreement with the majority opinion goes to the theory upon which I understand it to be based. Defendant is there held entitled to prevail on the theory that the bank still owes the city as a general depositor a greater sum than was paid on the city's behalf with the bank's money. This was based upon the premise that the bank is bound by the bogus ledger sheet exhibited by Hammer to the city official showing that the money had not been withdrawn from the sinking fund account in the bank. Actually the money had been withdrawn by one having authority to do so, and the debtor-creditor relation pertaining to general depositors in the bank no longer existed. In the absence of actual knowledge that Hammer was appropriating it to his own use, the bank had no authority to refuse payment on his checks. New Amsterdam Casualty Co. v. First Nat. Bank of Oklahoma City (1931) 154 Okla. 74, 6 P.2d 779. The evidence shows that the bogus ledger sheet was used by Hammer as an individual, not as agent of the bank, as is the view of the majority.